# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF MISSISSIPPI
# WESTERN DIVISION

| | |
|---|---|
| LATRINA KIMBLE | PLAINTIFF |
| VERSUS | № 3:07-CV-035-SAA |
| GRENADA COUNTY, MISSISSIPPI; ET AL. | DEFENDANTS |

## MEMORANDUM OPINION

Latrina Kimble has brought claims under 42 U.S.C. § 1983 and the Mississippi Tort Claims Act (MISS. CODE ANN. §§ 11-46-1 to -23 (2007)). Defendants Gloria Brown, James W. Latham, Jr., Jesse Gonzales, Chris McCain, and Mike Lovelace argue that qualified immunity shields them from Kimble's federal claims, MISS. CODE ANN. § 11-46-9(1) shields them from Kimble's state claims, and, consequently, the court should dismiss this case.

For the following reasons, motion is **GRANTED IN PART AND DENIED IN PART**.[1]

### I. FACTUAL BACKGROUND

Kimble is a 27 year old female resident of Tillatoba, Mississippi, in Yalobusha County. Plaintiff receives SSI disability payments due to mental disabilities. In September of 2006,[2] the plaintiff and her boyfriend, Jamal Matthews were driving through rural Grenada County after attending a barbeque. Jamal was driving and Latrina was riding in the passenger's seat of the

---

[1] Under 28 U.S.C. § 636(c), the parties expressly consented to the jurisdiction of a United States Magistrate Judge over this case, including entry of final judgment.

[2] The complaint alleges that the incident occurred on September 15, but plaintiff's memorandum in response to this motion, and most of the depositions, say that it occurred on September 18.

truck. The couple was debating whether to return to Latrina's home or to go to a hotel for a romantic interlude. As he was driving and during the time they were discussing this issue, Jamal pulled over on to the shoulder of the road, Highway 51 in Grenada County, to retrieve a plate of grilled steaks which had fallen onto the floorboard.

Meanwhile, Grenada County Deputy Sheriff Jesse Gonzales was on Highway 51. When he first saw the Matthews vehicle, it was on the side of Papermill Road with its lights off. He had seen the driver turn on the lights, advance to the stop sign at Highway 51, then turn onto the highway. (Gonzales Dep. at 10-11). When Matthews pulled off the highway, Gonzales pulled off behind him and turned on his blue lights because he thought the occupants of the vehicle may need assistance. (Id. at 11-12). Deputy Gonzales exited the patrol car, approached the Matthews vehicle and asked Matthews for his license. (Id. at 13). Whether Matthews gave Gonzalez his license (Matthews Dep. at 25) or his license number (Gonzalez Dep. at 70), Gonzalez then "ran" the license and learned that it had been suspended. (Id. at 13-14). He returned to the truck and informed Matthews that he was placing him under arrest for driving with a suspended license. (Id. at 14).

When Matthews stepped out of the truck, Gonzales placed him in handcuffs and positioned him outside the patrol car. (Id.). At some point he placed Matthews in the patrol car and told him to wait until another officer arrived to assist in searching the truck. Soon Deputy McCain, who had arrested Matthews a year earlier for possession of approximately fifty pounds of marijuana, arrived with a drug dog named "Mary Jane." (McCain Dep. at 14-15).

It is unclear when or which deputy asked the plaintiff Latrina Kimble to step out of the vehicle; however, the facts show that plaintiff was outside the truck standing on the side of the

road near the truck at the time that the officers and Mary Jane searched it. During the search Mary Jane indicated the possible presence of drugs in the vehicle, but it is undisputed that no drugs were found. The officer then asked Latrina to "pick my pocket," and she complied by pulling out her pocket and shaking her pants. (Kimble Dep. at 12). Plaintiff acknowledged that she was acting nervous. (*Id.*). Despite the fact that no drugs were found in the vehicle, the officers told the plaintiff that she was going to be transported to the Grenada County Jail to be searched by a female officer. (*Id.* at 14). Plaintiff testified that she told the officers that she did not have drugs or weapons, that she turned her pockets out and shook her pants (the officers did not touch her) and that she never consented to the search or to being transported to the jail to be searched.

Because Matthews was already in the back of his own patrol car, Gonzales asked Deputy Latham to take plaintiff to the police station to be patted down. (Gonzales Dep. at 22-23). Latham handcuffed plaintiff's hands in front of her body, placed her in the front passenger seat of the patrol car and drove her to the station; he removed the handcuffs once they reached the jail. (*Id.* at 14-15). At no time did she tell the officers that she did not want to go to the station or that she refused or did not want to be searched. (*Id.* at 16). In fact, she testified that she actually preferred to be searched by a female officer, which "sounded like a better deal" to her than to be searched by a male officer. (*Id.* at 16-17).

At the jail, they were met by jailer Gloria Brown, who asked the plaintiff to go into the restroom. Plaintiff says Brown instructed plaintiff to remove her clothing, shoes, and earrings and then asked plaintiff to squat and cough. (*Id.* at 18-21). She testified that Brown never touched her body or clothing and remained at a distance during what plaintiff says was a 25- to

30-minute search. (*Id.* at 20-23). She testified that no one else witnessed the search and that Brown was polite throughout the search process. (*Id.*). Brown, on the other hand testified that she told the plaintiff her name and that she was going to pat search her. Brown testified that the plaintiff indicated that the pat search was "okay." Brown contends she then conducted a pat search of the plaintiff that lasted less than five minutes. (Brown Dep. at 12). According to Brown, the only article of clothing that she asked the plaintiff to remove was her shoes and that removal of shoes is standard in a pat search. Brown testified that not only has she never conducted a strip search, but that there is no policy or procedure in the Grenada County Jail allowing an officer to conduct such a search . (*Id.* at 27-28). According to Brown, jail policy was that any strip search would have had to be performed by medical personnel and not a jailer or law enforcement officer. (*Id.*).

Despite conflicting facts regarding the method and duration of the search, it is uncontroverted that the search revealed that the plaintiff did not have any drugs or weapons on her person. After the search, plaintiff testified, she put her clothes back on, and Officer Brown returned with her to the front desk, from which she was escorted by Latham back to the patrol car. (Kimble Dep., at 27-28). They met Deputy Gonzales and Matthews entering as they exited the jail. (*Id.*). The officers allowed the plaintiff, at Matthews's request, to reach into Matthews's front pocket and get some money to use to pay his bail. (*Id.*). Latham then drove plaintiff, in the front passenger's seat and without handcuffs, back to the scene of Matthews's arrest where she was allowed to leave in Matthews's truck. (*Id.*). According to records and testimony in this case, the time from the initial traffic stop to the time plaintiff was returned to the truck totaled over an hour and a half. Plaintiff was never charged with any offense.

Plaintiff has sued Grenada County and the Sheriff and named deputies in both their official and individual capacities under 42 U.S.C. § 1983, claiming violation of her Fourth Amendment protections against false arrest and unlawful search and seizure. Plaintiff also brings claims under the Mississippi Tort Claims Act.

## II. LEGAL STANDARDS

Although the defendants originally sought relief via a motion to dismiss, this court will proceed under a summary judgment standard because the plaintiff presented matters from outside the face of the complaint, and defendants, who specifically argued a summary judgment standard in their original brief in support of the motion, replied in kind by also offering evidence outside the pleadings. *See* FED. R. CIV. P. 12(b).

**A. Summary Judgment Standard**

Under FED. R. CIV. P. 56(a), the court may grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. The movant has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 275 (1986) ("the burden on the moving party may be discharged by 'showing'...that there is an absence of evidence to support the non-moving party's case'); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Under Rule 56(e), the burden shifts to the non-movant to "go beyond the pleadings and by...affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 91 L. Ed. 2d at 274. That burden is not discharged by "mere allegations or denials." Fed. R. Civ. P. 56(e). All legitimate factual inferences must be drawn in favor of the non-movant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 216 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 91 L. Ed. 2d at 273. Before finding that no genuine issue for trial exists, the court must first be satisfied that no reasonable trier of fact could find for the non-movant. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 552 (1986).

**B. Qualified Immunity Standard**

A public official performing a discretionary function has qualified immunity in a civil case from damages, provided that the official's conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The court analyzes two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Only if the answer is "yes," does the court continue. Second, was the right clearly established at the time of incident? "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier*, 533 U.S. at 201. Supreme Court and Fifth Circuit precedents loom large in the court's analysis, but are not conclusive for establishing whether the law was "clearly established." *See Flores v. City of Palacios*, 381 F.3d

391, 395 n.3 (5th Cir. 2004). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow a question about) the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal *in the circumstances*." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997).

## III. DISCUSSION

### A. Jesse Gonzales is Not Entitled to Qualified Immunity

1. *Constitutional Violation*

Gonzales pulled behind Matthews' already-stopped truck and turned on his blue lights – not because he suspected any violation of law, but because he "thought they were have some kind of problem, vehicle problem or something . . ." (Gonzales Dep. at 12). After determining that Matthews and Kimble were okay, Gonzales asked for Matthews driver's license "to see if he had a legit driver's license or not." (*Id.*). In deposition, Gonzales was asked: "At that point had he [Matthews] broken any laws as far as you know?" (*Id.*, at 13). Gonzales responded: "No, sir." (*Id.*). In other words, his testimony is that he had no articulable – let alone reasonable – suspicion that a violation of law occurred when he pulled behind the truck or when he asked Matthews for his license.

Based on Gonzales's own testimony, the stop and detention were unreasonable. In *Delaware v. Prouse*, 440 U.S. 648 (1979), the Supreme Court held that without reasonable, articulable suspicion, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Prouse*, 440 U.S. at 663. As a passenger in the vehicle, the unreasonable stop and detention aggrieves Kimble equally. *See United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir.

1993) ("There is no question but that the stopping of a vehicle and the detention of its *occupants* is a 'seizure' within the meaning of the Fourth Amendment" (emphasis added)).  After securing Matthews for arrest, but before any other officer arrived at the scene, Gonzales told Kimble to "stay where you're at. Don't move." (Gonzales Dep. at 15). Without reasonable, articulable suspicion of criminal wrongdoing, Gonzales detained Kimble. That was an unreasonable seizure predicated on an unreasonable stop.

2. *Was the Right Clearly Established?*

As of March 2006, did the state of Fourth Amendment law give Gonzales fair warning that, *without reasonable, articulable suspicion of criminal wrongdoing*, it was unconstitutional to pull behind a stopped vehicle, detain the driver to check his license status, and detain the passenger?  It indeed did give fair warning.

Since 1979, the Fourth Amendment has demanded, at least, reasonable, articulable suspicion to detain a driver for purposes of checking the validity of his driver's license. *See Prouse*, 440 U.S. at 663. "An investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Jaquez*, 421 F.3d 338, 340 (5th Cir. 2005) (internal quotations and citations omitted). "It is well established that a policeman may not stop the driver of an automobile for investigation without at least some reasonable basis for suspecting the driver of a violation of law." *Blankenship v. Kerry County, Texas*, 878 F.2d 893, 895 (5th Cir. 1989). Without reasonable suspicion, the court can stop here because *Terry*'s objective test is inapplicable.

As such, the court concludes that Gonzales is not entitled to qualified immunity.

**B. Chris McCain is Entitled to Qualified Immunity**

    1. No Constitutional Violation

Under *Rakas v. Illinois*, 439 U.S. 128 (1978), an individual must have a reasonable expectation of privacy in the things seized or the places searched to assert a Fourth Amendment violation. *See, e.g.,* *Minnesota v. Carter*, 525 U.S. 83 (1998). Practically, the Fourth Amendment's protection of persons – not places, *see Katz v. United States*, 389 U.S. 347, 351 (1967), depends on which persons claim the amendment's protections.

*Rakas* also provides a clear rule that passengers may not contest vehicle search absent some ownership interest in the vehicle or other evidence demonstrating a reasonable expectation of privacy. *Rakas*, 439 U.S. at 148-50. Kimble has asserted neither an ownership interest in the truck nor other facts to create a reasonable expectation of privacy in Matthews' truck. Consequently, McCain's search of Matthews' truck did not violate Kimble's constitutional rights.

**C. James Latham is Not Entitled to Qualified Immunity**

    1. Constitutional Violation

James Latham arrived at the scene by happenstance. He had been on patrol in north Grenada County, when he saw the scene and stopped. (Latham Dep. at 8). When he arrived, Gonzales told Latham that "he needed somebody to transport [Kimble] because they didn't have a female deputy or other female on the police department available, asked me to transfer her to the – transport her to the jail and have her searched and then bring her back." (*Id.* at 9). Without talking to anyone else, Latham transported Kimble to the jail, saw that she was searched, and brought her back to the scene. (*Id.* at 10). He does not remember whether he handcuffed her,

although, he says, if she was, it was in front, not behind her back. He does remember that she sat in the front seat on the way to and from the jail. (*Id.* at 9-10).

When arriving to the scene, a police officer may rely on the initial officer's information to justify the later-arriving officer's conduct. "However, it is **not** reasonable for an officer to conclude that it is lawful to make . . . a search when his fellow officer does not provide him with any specific articulable facts from which a reasonable officer could think" a subsequent search was justified. *Estep v. Dallas County, Texas*, 310 F.3d 353, 361 (5th Cir. 2002) (emphasis added). *Estep* involved vehicle frisk to ensure officer safety under *Michigan v. Long*, 463 U.S. 1032 (1983). Although factually distinct, *Estep*'s discussion of transferring one officer's information to another is informative here. In fact, *Estep*'s discussion of a search provides with even more force to Latham's seizure and detention of Kimble, where there has been no suggestion that officer safety played any role in the decision to search. *See, e.g., Petta v. Rivera,* 143 F.3d 895, 899 (5th Cir. 1998) (prior cases need not hold that particular conduct is unlawful so long the unlawfulness of the action is apparent from pre-existing law).

Latham arrived on the scene, asked no question, merely abided by Gonzales's directive to transport Kimble. Following a fellow officer's directive, as a means of assistance, does not shield Latham. Absent reasonable suspicion or probable cause, Latham unconstitutionally seized Kimble. In this analysis, having Kimble sit in the front seat is immaterial; whether she was handcuffed does not matter; and whether she "consented" means nothing.

Finally, *Terry v. Ohio*'s limited pat down exception does not help Latham. *Terry* allows officers to search for weapons out of concern for their safety. *Terry v. Ohio*, 392 U.S. 1, 30 (1968), but Gonzales testified that he told Kimble that he was having her transported to "make

sure you have no drugs." (Gonzales Dep. at 21). Latham had no reasonable, articulable suspicion, or at least offered none to the court, that would justify a *Terry* frisk independently. In fact, in the light most favorable to Kimble, he appears to have had no fear for his safety. Otherwise, why would he have transported Kimble (1) in the front seat (2) without handcuffing her hands behind her back? See (Latham Dep. at 9-10).

Latham also testified that he did not speak to Kimble about whether she consented to the off-site search. (Latham Dep. at 10). Although he says he told her she was not under arrest, he did not tell her that she could refuse the search or that she was free to go at any time because she was not under arrest. (*Id.* at 11). Toward the end of his deposition, Latham testified that he had been told that Kimble consented to the off-site search, (*id.* at 16), but he did not say who told him or the circumstances of the alleged consent. Latham's testimony is equivocal; coupling it with the other deposition testimony in this case creates, especially in the light most favorable to Kimble, a genuine issue of material fact about whether she consented. On the facts before the court, however, Latham unreasonably seized Kimble without probable cause or a warrant.

    2. *Was the Right Clearly Established?*

As of September 2006, would the law give a reasonable officer fair warning that, without reasonable suspicion or probable cause, and relying on a fellow officer's word alone, it was unconstitutional to seize an individual, transport that person to a county jail, and ask the jailor to search the person for drugs? The court concludes that it would have.

Fourth Amendment analysis is fact-intensive. Finding a prior case with the exact same facts is rare. Fortunately, the Fifth Circuit does not require that level of congruence. *See Estep, 310 F.3d at 366* ("There is no Supreme Court or Fifth Circuit precedent that is factually on all

fours with this case, but we would not expect that because, as the Supreme Court has recognized, the Fourth Amendment inquiry is so fact-specific."). Except in the rare instance, courts are left to analogize the pending case to prior ones, matching them as reasonably appropriate.

Supreme Court and Fifth Circuit precedent clearly establish that Latham's conduct, as described here, was illegal. First, it is axiomatic that an officer seizes a person when he, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16). Second, it was clear in September 2006 that probable cause requires that "the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a man of reasonable caution in the belief that the person to be arrested has committed or is committing an offense." *United States v. Orozco*, 982 F.2d 152, 154 (5th Cir. 1993). Third, it was clearly established in September 2006 that a detention is objectively unreasonable without reasonable suspicion that the person is engaged in criminal activity, *Brown v. Texas*, 443 U.S. 47, 51 (1979), and that a warrantless arrest is objectively unreasonable if the police officer lacks probable cause. *United States v. Watson*, 423 U.S. 411, 417-24 (1976); *Michigan v. Summers*, 452 U.S. 692, 699-701 (1981).

Beyond these bedrock principles, it was further clearly established that police officers face § 1983 liability when they personally participate in an unconstitutional search and seizure. *See Creamer v. Porter*, 754 F.2d 1311 (5th Cir. 1985) (officer who was bystander dismissed); *Watson v. Interstate Fire & Cas. Co.*, 611 F.2d 120 (5th Cir. 1980) (sheriff with no personal involvement properly dismissed); *Estep*, 310 F.3d at 353 (unreasonable for officer to conduct *Long* car frisk when initial officer had no articulable facts for a reasonable officer to sense

-12-

danger). Under the facts presented here, reliance upon a statement from another officer that Kimble "consented" will not insulate Latham from suit.

### D. Gloria Brown is Not Entitled to Qualified Immunity

#### 1. Constitutional Violation

For Brown, the court is faced with a disputed, genuine issue of material fact – the scope of the jail search. Kimble contends that the search was a full strip search; Brown contends that it was a pat-down search. No one else was there. For this first step, though, the dispute is immaterial because this court "must evaluate whether a plaintiff's allegations, *if true*, establish a constitutional violation." *Williams v. Kaufmann County*, 352 F.3d 994, 1002 (5th Cir. 2003). They do. Strip searching an individual without individualized, probable cause is unlawful. *See Williams v. Kaufmann County*, 352 F.3d 994, 1007 (5th Cir. 2003). As for probable cause, Brown had none. ( See Brown Dep. at 15-16). Therefore, for qualified immunity purposes, she violated Kimble's constitutional rights.

#### 2. *Was the Right Clearly Established?*

Brown was on fair notice that strip searching an individual, without probable cause, was illegal. The Fifth Circuit, on at least three occasions before the date of this incident, had held that strip searching without probable cause violates the Fourth Amendment.

In *Stewart v. Lubbock County, Texas*, 767 F.2d 153 (1985), the Circuit invalidated a sheriff's policy of strip searching in the county jail minor-offense arrestees for whom the officers had no reasonable suspicion of possessing weapons or contraband. *Stewart*, 767 F.2d at 156-57. In *Watt v. City of Richardson Police Department*, 849 F.2d 195 (5th Cir. 1988), the court held that a strip search of an *inmate* was unconstitutional when the inmate's charge was minor, his

-13-

criminal record paltry, and his personal characteristics "at odds with reasonable fears about prison security." *Watt*, 849 F.2d at 198-99.

Finally, in *Williams v. Kaufmann County*, 253 F.3d 994 (5th Cir. 2003), the Circuit concluded that police officers unconstitutionally strip-searched individuals when the officers had no reasonable suspicion or probable cause to believe the people were doing anything but simply being in the club when police executed a narcotics search warrant. 352 F.3d at 1004-05. The *Williams* court also held that, as of 1995, it was clearly established that strip searching without probable cause is illegal. *See Williams*, 352 F.3d at 1007.

For these reasons, Brown is not entitled to qualified immunity from plaintiff's federal claims.

### E. Claims under Mississippi Law

Kimble also makes claims under the Mississippi Tort Claims Act, MISS. CODE ANN. §§ 11-46-1 to -23. By the Act, the State of Mississippi has waived its sovereign immunity from suit. In doing so, it qualified the waiver. Section 11-46-9(1)(c) shields political subdivisions and their employees from liability when they provide police services "unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." MISS. CODE ANN. § 11-46-9(1)(c). Reckless disregard "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or a wrongful act." *Miss. Department of Public Safety v. Durb*, 861 So. 2d 990, 994 (Miss. 2003).

Based on the record before it, the court concludes that, at minimum, genuine issues of material fact abound on whether all defendants except Chris McCain acted with "reckless disregard" as contemplated by the Mississippi Tort Claims Act. For that reason, the court

exercises its discretion to allow Kimble's state law claims to proceed against Gonzales, Latham and Brown. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (trial court may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial").

## IV. Conclusion

The defendants' motion [№ 34] is **GRANTED IN PART AND DENIED IN PART** as follows:

    (1)    **DENIED** as to Jesse Gonzales;

    (2)    **GRANTED** as to Chris McCain;

    (3)    **DENIED** as to James Latham;

    (4)    **DENIED** as to Gloria Brown.

The motions of defendants sheriff Alton Strider [№ 10] and of Deputy Mike Lovelace are dismissed as moot due to plaintiff's voluntary dismissal of her claims against them.

    **SO ORDERED**, this the 21st day March, 2008.

    */S/ S. Allan Alexander*
    UNITED STATES MAGISTRATE JUDGE